HAMILTON, Circuit Judge.
All employees, not only perfect employees, are protected by Title VII. Norma Perez was in all likelihood far from a perfect employee. From 2005 until 2009 she worked for Thorntons, Inc., a gasoline and convenience store chain. She was working as a retail store manager in November, 2009 when she deeply discounted about $127 worth of candy bars that she sold to herself for only $12. She was fired for failure to “control cash and/or inventory.” But only a few months earlier, Perez’s non-Hispanic male supervisor had committed a similar act and was merely warned, not fired.
Perez brought suit under Title VII of the Civil Rights Act of 1964 for gender and national origin discrimination. The district court granted summary judgment in Thorntons’ favor. If Perez discounted the candy she “bought” without permission, her behavior was wrongful, and a jury might well find that her firing was not tainted by unlawful bias. In reviewing a grant of summary judgment, however, we must give Perez the benefit of conflicts in the evidence and any reasonable inferences in her favor. In that light, a jury could find that Perez’s wrongdoing for which she was fired was comparable to the wrongdoing of her non-Hispanic male supervisor, and that the supervisor’s animus against women and Hispanics tainted the decision to fire her. Based on this record, a jury must sort out the conflicting evidence and decide why Thorntons chose to treat arguably similar wrongdoing so dif *701 ferently. Accordingly, we reverse the district court’s judgment and remand for further proceedings.

Facts for Summary Judgment

We assume that the following facts are true for purposes of summary judgment. Perez was hired by Thorntons in January, 2005 as a customer service representative in its store in Cicero, Illinois. Her job included stocking the shelves and operating the cash register. She was promoted a year later to retail store manager. Her duties then included supervising the customer service representatives at the store. In November 2008, she was transferred to a different store located in Summit, Illinois. Bill Darlington was Perez’s regional manager. He made the original decision to hire her and then promoted her and transferred her. The Summit store was a “high volume” store, and Darlington believed that a transfer to the Summit store would broaden Perez’s management experience.
At the Summit store, Perez’s immediate supervisor was store general manager Donald Koziol. When Perez and Koziol met, Koziol told her that “he [didn’t] want [her] in the store; that he [didn’t] want to work with [a] woman.” Perez informed Darlington about Koziol’s comments, and informed him of her preference to remain at the Cicero location. Darlington refused to return Perez to the Cicero store, telling her that she either had to work where he had assigned her or would lose her job with Thorntons. Perez testified that later, in the summer of 2009, Koziol said to Perez, “this is the reason why I don’t like to work with women, always have something to do with the kids or they have a period.” He also told her that he “did not like” Hispanics. However, Perez did not disclose these later remarks to Darlington or anyone else at Thorntons.
Every month, each Thorntons store received a “Sales Planner” from the store support center that identified upcoming store promotions and items that would be specifically promoted for sale with discounted prices. Stores were required to follow these directives strictly. Every month each store conducted a “change over,” changing the manner in which particular products were priced as dictated by the Sales Planner.
During a store visit in October 2009, Darlington noticed that the candy inventory was low. When Darlington talked to Koziol and Perez about the store’s candy bar sales, Darlington learned that the store’s cashiers had deviated from the Sales Planner’s directive. Cashiers had been allowing customers to pay sale prices for full-priced candy bars, using a sale-priced bar to scan the purchase of the full-priced bar into the register. Darlington warned both Koziol and Perez that they could not swap full-priced candy for discounted candy.
The November 2009 Sales Planner ordered that pre-priced versions of Nestle brand candy bars were to be sold at a price of two for $2.22. The Summit store was scheduled for change over on November 4, 2009. On the date of the change over, Perez rang up approximately 80 of these candy bars and sold them to herself. Her transactions were captured on store video and were recorded in the cash register’s memory. Perez initially rang up the candy bars at the approved price — two for $2.22 — but then performed a manual price override, ultimately charging herself only 15 cents for each candy bar.
A few days later, Darlington conducted a routine review of the store’s video surveillance and saw Perez buy a large number of candy bars at the approved price, void the transactions, manually override the price, and walk out of the store carry *702 ing the discounted candy bars she had purchased. Darlington reported what he had seen to Lori Roberts, the human resources manager for Thorntons’ Northern Division. Darlington then went to the store to investigate. He met with Koziol and showed him the video footage of Perez buying the candy. He asked Koziol if he was aware that Perez had purchased the candy after performing the price overrides. Koziol denied having any knowledge of the incident or giving Perez permission to make the purchase. Darlington then called Perez at home. Darlington told her to report to the store immediately for a meeting. When she arrived, Darling-ton initiated a conference call with Roberts. Darlington, Roberts, and Perez were the only people on the call. Darlington showed Perez the video footage and asked her to explain the price overrides.
Perez’s account diverges from Darling-ton’s and Roberts’ at this point, but of course, on summary judgment, we must accept Perez’s version as true.[1] Perez testified that she told Darlington and Roberts that she had Koziol’s permission to conduct the price overrides. Darlington suspended Perez until further notice. Perez departed and Darlington consulted with Roberts. Darlington told Roberts that he wanted to fire Perez. Roberts concurred with that decision, and Darlington and Roberts then notified their respective superiors of Perez’s termination. Darlington notified the regional vice president, Sam Picone. Roberts notified the executive vice president of human resources, Brenda Stackhouse. Neither Picone nor Stack-house objected to Darlington’s decision.
On November 10, 2009, Roberts called Perez at home and told her she was being fired. The personnel action form noted failure “to control cash and/or inventory” as the reason for her termination. Thorn-tons later clarified that Perez was fired for her failure to adhere to prices stated in the November Sales Planner and for violating Thorntons’ “Write-Off Policy.” The Write-Off Policy prohibited managers from writing off more than $25 of merchandise without an auditor as a witness. Although the Write-Off Policy was in effect during Perez’s employment, Thorn-tons has not pointed to evidence in the record showing that she knew of its existence, or that she knew the Write-Off Policy would trump permission from her immediate supervisor.
If that were the entire record, Perez would not have a viable claim for discrimination. But a few months before Darling-ton terminated Perez, store manager Ko-ziol used his personal credit card to “buy” a large quantity of beer and wine from the store at full price. The store support center noticed the transaction and reported it to regional vice president Picone. Picone and Darlington confronted Koziol about his transaction. Koziol explained to both supervisors that he had discovered that beer and wine were missing from the Summit store. Koziol suspected that it had been stolen, but he did not know by whom. He attempted to cover up the missing inventory by making a dummy purchase on his own credit card so that the shortage would not be discovered during an upcoming corporate audit. He claimed that he wanted time and opportunity to identify the culprits on his own. His idea, he told his supervisors, was that if the theft went *703 undetected, the thieves might return to try to steal more alcohol, giving Koziol the chance to catch them in the act. Koziol did not have Thorntons’ permission to run his sting operation in the Summit store. In spite of the fact that, at best, Koziol had engaged in a cover-up and was -risking additional theft, Picone issued a written reprimand and a warning to Koziol, but Koziol kept his job. Darlington testified that he was involved in Picone’s “coaching” of Koziol.

Analysis

Perez brought suit under Title VII of the Civil Rights Act of 1964 for national origin and gender discrimination. See 42 U.S.C. § 2000e-2. She contends that Thorntons fired her because she is Hispanic and a woman. Thorntons moved for summary judgment on her claims. The district court granted summary judgment in Thorntons’ favor, and Perez has appealed. Summary judgment is proper if the “movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a). We review de novo a ruling granting summary judgment. Arizanovska v., Wal-Mart Stores, Inc., 682 F.3d 698, 702 (7th Cir.2012). Examining the evidence in the light most favorable to Perez, and construing all inferences in her favor, we will affirm summary judgment only if there are no genuine issues of material fact and Thorntons is entitled to judgment as a matter of law. Naficy v. Illinois Dep’t of Human Servs., 697 F.3d 504, 509 (7th Cir.2012).
Under current law, there are two ways Perez may prove her claims: the “direct” and “indirect” methods of proof. Collins v. Amer. Red Cross, 715 F.3d 994, 999 (7th Cir.2013). “Under the direct method, a plaintiff must provide either direct or circumstantial evidence that the employer had a discriminatory motivation. And under the indirect method, a plaintiff must satisfy the familiar requirements of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).” Id. (internal citations omitted). But we recognize and join the majority of active judges in this circuit who have opined that the time has come to jettison the “ossified direct/indirect paradigm” in favor of a simple analysis of whether a reasonable jury could infer prohibited discrimination. See Hitchcock v. Angel Corps., Inc., 718 F.3d 733, 737 (7th Cir.2013), citing Coleman v. Donahoe, 667 F.3d 835, 863 (7th Cir.2012) (Wood, J., concurring) (“By now, ... the various tests that we insist lawyers use have lost their utility- In order to defeat summary judgment, the plaintiff one way or the other must present evidence that she is in a class protected by the statute, that she suffered the requisite adverse action (depending on her theory), and that a rational jury could conclude that the employer took that adverse action on account of her protected class, not for any noninvidious reason. Put differently, it seems to me that the time has come to collapse all these tests into one.”); Naficy, 697 F.3d at 514 (citing Coleman concurrence with approval); Good v. Univ. of Chi. Med. Ctr., 673 F.3d 670, 680 (7th Cir.2012) (“the direct and indirect methods for proving and analyzing employment discrimination cases ... have become too complex, too rigid, and too far removed from the statutory question of discriminatory causation”); and Harper v. C.R. England, Inc., 687 F.3d 297, 313-14 (7th Cir.2012) (discussing Coleman concurrence and applying a more streamlined, collapsed version of the direct/indirect tests).
Perez contends that her claim survives under either the indirect or the direct methods. We conduct our analysis under those traditional tests, and we find, as *704 explained below, that under each method Perez has raised issues of material fact that merit resolution by a jury. The similarity of the analysis helps show, however, that the differences between the methods are narrowing.
I. Indirect Method
Under the indirect method, a plaintiff must first establish a prima facie case by providing evidence “that (1) she is a member of the protected class; (2) she met her employer’s legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably.” Naficy, 697 F.3d at 511. In disparate punishment cases, like this one, the second and fourth prongs merge and are satisfied by a showing that a similarly situated employee outside the plaintiffs protected class committed a similar act but was subjected to less severe discipline. Elkhatib v. Dunkin Donuts, Inc., 493 F.3d 827, 831 (7th Cir.2007). If the plaintiff makes this showing, the burden shifts to the employer “to introduce a legitimate, nondiscriminatory reason for the employment action.” Naficy, 697 F.3d at 511. Then, if the employer meets that burden of production, the burden shifts back to the plaintiff to provide evidence that the employer’s stated reason was pre-textual. Id. at 511-12.
A. Similarly Situated Co-worker
The district court found that Perez failed to establish her prima facie case because she failed to demonstrate that a similarly situated employee outside of her protected class engaged in conduct similar to hers but was subjected to less severe discipline. “All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. ... The ‘similarly situated’ prong establishes whether all things are in fact equal.” Filar v. Board of Educ. of City of Chicago, 526 F.3d 1054, 1061 (7th Cir.2008) (internal citation omitted).
To satisfy this requirement, a plaintiff must identify at least one employee who is directly comparable to her in all material respects. See Coleman, 667 F.3d at 846. The purpose of the inquiry is to “eliminate other possible explanatory variables, ‘such as differing roles, performance histories, or decisionmaking personnel, which helps isolate the critical independent variable’— discriminatory animus.” Id., quoting Humphries v. CBOCS West, Inc., 474 F.3d 387, 405 (7th Cir.2007), aff'd, 553 U.S. 442, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008). The proposed comparator need not be identical in every conceivable way, however, and courts must conduct a “commonsense examination.” Coleman, 667 F.3d at 846 (quotation omitted).
To satisfy this requirement, Perez argues that Koziol, her non-Hispanic male supervisor, committed an infraction comparable to hers but was not disciplined as severely as she was. Perez openly purchased candy bars at a marked down price with (we must assume) Koziol’s permission. She was fired. Koziol covered up theft from the store and, without the consent of his supervisors, concocted a one-man sting operation that invited additional theft — yet he was merely warned. Thorn-tons argues that Koziol’s conduct is not comparable to Perez’s conduct because Thorntons suffered no actual economic harm as a result of Koziol’s act. A jury might buy that explanation, but we cannot resolve that issue on summary judgment. Koziol’s act covered up a much larger actual economic loss and put Thorntons at a high risk of future actual economic loss. Also, Koziol acted in secret, without the knowledge or permission of his supervisor. *705 Perez, though, purchased the discounted candy bars openly and with, we must assume, Koziol’s consent. At the end of the day, both of these infractions involved inventory control, and yet the employees were treated very differently by Thorn-tons’ higher management. We believe it should be left to a jury to decide whether they were similar enough to support an inference of discrimination.
Our dissenting colleague disagrees, noting as we often have that “we do not sit as a super-personnel department to determine which employment infractions deserve greater punishment. It is enough that the misconduct that led to the adverse job action in question is sufficiently distinct to render the proposed comparators not similarly situated.” Post at 714 (emphasis added), quoting Harris v. Warrick County Sheriff’s Dep't 666 F.3d 444, 449 (7th Cir.2012). On this basis, the dissent accepts Thorntons’ stated explanation for firing Perez but not Koziol — that Perez’s conduct caused “actual loss to the company” while Koziol’s “had no such effect.” Post at 714.
At first glance that is true, but the picture for purposes of summary judgment is more complex. Koziol’s conduct was deceptive, done secretly and without the consent of a supervisor. Perez, by contrast, acted openly and with the consent of her supervisor. In addition, Koziol’s act caused no actual loss to the company only because he was improperly covering up a real theft. Moreover, he concocted an “investigation” that would have risked additional loss if he had not been caught. Ultimately, the crux of the issue is whether Perez’s and Koziol’s misdeeds were “sufficiently distinct” to distinguish meaningfully between them at summary judgment, or whether a jury could reasonably find they were comparable. We believe that the arguable differences between causing modest actual economic loss with the consent of a supervisor and covering up a significant theft and risking additional economic loss without the consent of a supervisor are too fine to make as a matter of law on summary judgment. Whether Perez’s and Koziol’s misconduct was comparable is a genuinely disputed issue of material fact.
Thorntons argues further, however, that whether or not Perez had Koziol’s consent is immaterial because even with his consent, Perez’s purchase still violated Thorn-tons’ Write-Off Policy. That policy prohibits any write-offs of more than $25 by any employee except with the express permission of a corporate auditor. Thorntons presented evidence that the Write-Off Policy was in place while Perez was employed with Thorntons, but it has not pointed us to evidence that Perez knew of its existence or that she would have had any other reason to believe that Koziol’s permission was insufficient to bless her action. Also, at the time of Perez’s firing, Thorn-tons’ stated reason for its decision was her failure to “control cash and/or inventory,” and Koziol’s infraction would also certainly qualify for that description.
Thorntons also argues that Koziol is not comparable to Perez because they were disciplined by different decision makers— Koziol by Pieone and Perez by Darlington. This argument is belied outright by Dar-lington’s deposition testimony that was the basis of Thorntons’ motion for summary judgment. Darlington testified that he was present when Pieone confronted Ko-ziol and was involved in the decision to warn but not terminate Koziol. He also testified that he advised Pieone of Perez’s infraction, and that Pieone assented to Darlington’s decision to fire Perez. Dar-lington and Pieone were both sufficiently involved in both Koziol’s and Perez’s discipline to undermine Thorntons’ argument, at least as a matter of law.
*706 Our dissenting colleague believes that we should not consider the evidence of Darlington’s involvement in Koziol’s discipline because Perez “admitted” in response to Thorntons’ Local Rule 56.1 statements that Picone played no role in Darlington’s decision to discharge Perez and “Darlington played no role in Picone’s discipline decision regarding Koziol’s June and July 2009 beer purchase.” Post at 712, citing Dkt. 59, ¶¶ 41, 45 (Thorntons’ Local Rule 56.1 Statement of Undisputed Facts) and Dkt. 62, ¶¶ 41, 45 (Perez’s Response). The point is an important one because of the procedures that district courts use to clarify and sharpen the issues to be decided on a summary judgment motion. And Perez did not respond in the district court as clearly as she should have.
The problem, though, is that Thorntons’ same paragraphs of supposedly undisputed facts and its evidence offered to support its Local Rule 56.1 Statement contradict its assertions that Darlington played no role in Picone’s decision to discipline but not fire Koziol and that Picone played no role in the decision to fire Perez. Where the moving party has undermined its own Local Rule 56.1 assertion through the presentation of contradictory assertions and evidence, a nonmovant’s “admission” of the movant’s assertion is not decisive. To find otherwise would serve only to reward parties who successfully obfuscate the record and engage in “gotcha” litigation tactics.
Thorntons’ paragraphs about Koziol’s wrongdoing and Picone’s decision merely to warn him show on their face that Dar-lington was involved in the investigation, the disciplinary decision, and the warning. In fact, the paragraphs do not even cite any testimony from Picone himself. They rely instead on Darlington as the source of evidence about Koziol’s wrongdoing, its discovery, the investigation, and the disciplinary decision. Dkt. 59, ¶¶ 43-45. That fact alone should raise doubts about the assertion that Darlington “played no role” in the decision.
The evidence cited by Thorntons also directly controverts its assertion. At pages 89 to 95 of Darlington’s deposition, he described his own investigation of Ko-ziol’s conduct, with only brief mention of Picone’s involvement:
Q: And supposedly Mr. Koziol was making this private purchase to make up for that shortage, correct?
A: Correct.
Q: What did he tell you it was for?
A: He told me he wanted to pay the shortage so it wouldn’t appear on his weekly counts that he had a beer shortage. He wanted the store and the team members at the store to think that there was no issue. He thought by doing that, the person who was stealing from him would just keep doing it and he would catch them. That was Don’s [Koziol’s] words to me.
Id. at 89-90, cited by Dkt. 59, ¶ 44 (emphasis added).
And this exchange, at page 92 of Dar-lington’s deposition, was also presented to the district court as evidence underlying Thorntons’ 56.1 Statement:
Q: Did Mr. Koziol tell you who he suspected, if anyone, of theft?
A: No.
Q: Did you ask?
A: Yes.
Q: Did he refuse to answer?
A: No, he said he didn’t know.
Id. at 92, cited by Dkt. 59, ¶ 44 (emphasis added).
Darlington’s own testimony described his role in the decision-making process for Koziol:
*707 Q: To your knowledge, was there any discussion about termination of Don Ko-ziol because of this?
A: It was taken into consideration.
Q: Was your opinion sought with regard to whether or not Don Koziol should be terminated for this situation?
A: There’s only one reason why Don did not get terminated.
Q: And why is that?
A: Because he put, personally, on his credit card and not created a shortage for Thorntons. We checked.... He took his own money, his own credit card and paid that credit card statement. So we took that as a write-up; and if it happens again, you will be terminated. But since it did not cause us any shortage, was the difference.
Q: But it was a violation of company policy?
A: Sure was.
Q: Including he falsified documents, did he not?
A: Sure did.
Q: Was this a performance opportunity for coaching?
A: It was more than coaching.
Q: That was by you and others?
A: By me and Sam Picone.
Id. at 93-95, cited in Dkt. 59, ¶ 44 (emphasis added).
Thus, Thorntons’ assertion in its Local Rule 56.1 Statement that “Darlington played no role in Picone’s discipline decision regarding Koziol’s beer purchase other than presenting Koziol with the written reprimand in August 2009” cannot be reconciled with the rest of the paragraph and with Thorntons’ own evidence. There is ample evidence from Thorntons itself that Darlington was at the center of the investigation of Koziol and was present and involved in the decision not to fire him just a few months before he decided to fire Perez for arguably comparable wrongdoing.
The issue of Picone’s involvement in the decision to fire Perez presents similar problems for Thorntons. The Local Rule 56.1 Statement of supposedly undisputed facts shows on its face that Darlington consulted his boss, Picone, before firing Perez. Dkt. 59, ¶ 41. A jury could certainly infer that Darlington was seeking his boss’s consent and that Perez would not have been fired if Picone had disagreed.
In response to Thorntons’ motion for summary judgment, Perez pointed out that Thorntons’ filings contradicted themselves. That assertion was too general, but as noted, the contradictions were evident from the face of Thorntons’ own statement of supposedly undisputed facts. They became stark upon the lightest scrutiny of the cited evidence. It was not necessary for Perez to present contradictory evidence to show a genuine issue of fact; Thorntons itself had already done so.
Even if the record were less clear, however, Thorntons’ argument that Darlington and Picone acted so independently that Koziol and Perez cannot meaningfully be compared misses the mark. The point of determining whether different decision makers were responsible is to determine whether two employees were held to different standards by virtue of the different perspectives and expectations of different and independent decision makers. The inference of discrimination is weaker when there are independent decision makers since they “may rely on different factors when deciding whether, and how severely, to discipline an employee.” Ellis v. United Parcel Service, Inc., 523 F.3d 823, 826 (7th Cir.2008). But in this familiar supervisory structure, where a supervisor and his supervisor were both involved in the decision-making process for both employees, and the employees under review were *708 subject to the same standards, an employer cannot defeat the inference of impermissible disparate treatment by designating one supervisor as the nominal decision maker for one decision and the other supervisor as the nominal decision maker for the other. See, e.g., Coleman, 667 F.3d at 848 (employees were similarly situated although immediate supervisors not identical; higher-level decision maker was “responsible” for employees’ discipline). Even without Darlington’s testimony, Thorntons’ statement of undisputed fact shows that Darlington and Picone were acting in concert in both decisions, each fully aware of what the other was doing and why. Darlington sought Picone’s approval for firing Perez; Darlington was present and involved when Picone disciplined Koziol. The bare statements that Picone was the nominal decision maker for Koziol and Darlington for Perez do not distinguish Koziol from Perez, at least as a matter of law.
In sum, Perez and Koziol answered to the same decision makers, were measured by the same standards, and committed similar but not identical infractions, yet Perez, a Hispanic female, was fired and Koziol, a non-Hispanic male, was not. In reviewing a grant of summary judgment, we must view the facts and record in a light most favorable to Perez, and on this record, the two were arguably similar enough to support a prima facie case. Perez satisfied her prima facie burden under the indirect method of proof.
B. Pretext
Perez must next offer evidence supporting an inference that Thorntons’ stated non-discriminatory reason for her termination — failure to “control cash and/or inventory” — was a pretext for illegal discrimination. Perez “must present evidence suggesting that the employer is dissembling.” O’Leary v. Accretive Health, Inc., 657 F.3d 625, 635 (7th Cir.2011). “The question is not whether the employer’s stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge.” Id. “It is not the court’s concern that an employer may be wrong about its employee’s performance, or may be too hard on its employee. Rather, the only question is whether the employer’s proffered reason was pretextual, meaning that it was a lie.” Naik v. Boehringer Ingelheim Pharmaceuticals, Inc., 627 F.3d 596, 601 (7th Cir.2010), quoting Ineichen v. Ameritech, 410 F.3d 956, 961 (7th Cir.2005).
There is no dispute that Perez discounted the candy and completed the purchase, and no suggestion that Thorn-tons fabricated the incident or its belief that the incident happened. However, “[i]f the stated reason, even if actually present to the mind of the employer, wasn’t what induced him to take the challenged employment action, it was a pretext.” Forrester v. Rauland-Borg Corp., 453 F.3d 416, 418 (7th Cir.2006). There is sufficient evidence in this record to infer that the discounted purchase was not Thorntons’ true reason for Perez’s termination.
For purposes of Thorntons’ motion for summary judgment, we assume that Ko-ziol, who had previously made sexist remarks, granted Perez permission to mark down the candy. We also assume that Darlington knew of Koziol’s prior expression of bias, but when he learned of Perez’s discounted purchase, chose to believe Koziol over Perez when Perez told him that she had Koziol’s permission and Ko-ziol said she did not.[2] Darlington also *709 knew when he decided to fire Perez that Koziol had committed a similar infraction a few months earlier but had not been fired. A jury could reasonably infer from these facts that Thorntons’ decision to fire Perez was discriminatory and that its stated reason for its decision was a pretext. See Coleman, 667 F.3d at 857-59 (different treatment of comparable employees can support inference of pretext), citing McDonnell Douglas v. Green, 411 U.S. at 804, 93 S.Ct. 1817, and other cases.
Thorntons argues that any inference of discrimination is negated because Darlington both hired and promoted Perez before he fired her. The “common actor” or “same actor” inference is a reasonable inference that may be argued to the jury, but it is not a conclusive presumption that applies as a matter of law. Blasdel v. Northwestern Univ., 687 F.3d 813, 820 (7th Cir.2012), citing Herrnreiter v. Chicago Housing Auth., 315 F.3d 742, 747 (7th Cir.2002). The argument is that if the decision maker was unbiased when he hired or promoted the plaintiff, it’s reasonable to infer that he was unbiased when he later fired the plaintiff. That inference is “something for the trier of fact to consider.” Herrnreiter, 315 F.3d at 747.
Our dissenting colleague asserts that Koziol’s sexist comments were “stray remarks” that do not support a finding of pretext. Post at 714-15, citing Merillat v. Metal Spinners, Inc., 470 F.3d 685, 694 (7th Cir.2006). Standing alone, biased comments do not establish discriminatory motive unless they were by the decision maker and can be connected to the decision. See, e.g., Overly v. KeyBank Nat. Ass’n, 662 F.3d 856, 865 (7th Cir.2011); Davis v. Time Warner Cable of Southeastern Wis., L.P., 651 F.3d 664, 672-73 (7th Cir.2011); Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 491 (7th Cir.2007) (“Isolated comments that are no more than stray remarks in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus.”) (quotation omitted).
If Koziol’s biased remarks stood alone here, we might agree. But they do not. For purposes of summary judgment, we must assume also that Darlington, who later decided to terminate Perez, was informed of Koziol’s bias, chose to place Perez at his store anyway, and later, when Darlington investigated Perez’s decision to sell the discounted candy to herself, was told by Perez that Koziol had given permission for her purchase. Koziol denied that he had done so. Darlington chose to credit Koziol in spite of his knowledge that Koziol harbored a sexist bias. Also, Dar-lington knew at the time that he decided to terminate Perez that Koziol himself had committed a similar infraction a few months earlier but had not been fired. A jury could reasonably infer from this record that Thorntons’ stated reason for its decision to fire Perez was a pretext.
*710 This case actually highlights an interesting linkage, or perhaps a disconnect, between the cases using the “common actor” inference and cases dealing with “stray remarks.” The common actor inference says it is reasonable to assume that if a person was unbiased at Time A (when he decided to hire the plaintiff), he was also unbiased at Time B (when he fired the plaintiff). Again, that is not a conclusive presumption, but we treat it as a reasonable inference. E.g., Herrnreiter, 315 F.3d at 747. Some “stray remarks” cases, though, seem to conclude that if a person was racist or sexist at Time A (time of the remark), it is not reasonable to infer that the person was still racist or sexist at Time B (when he made or influenced the decision to fire the plaintiff). See, e.g., Bahl v. Royal Indemnity Co., 115 F.3d 1283, 1293 (7th Cir.1997). Cf. Hunt v. City of Markham, 219 F.3d 649, 652-53 (7th Cir.2000) (courts must take care not to over-read “stray remarks” cases; remarks may be probative of discriminatory intent if made by decision makers or those with input into the decision, and if made around the time of and in reference to adverse employment action).
It is not clear why one inference should be reasonable and the other not. The question, however, need not be answered in the abstract. In this case, plaintiff Perez has offered evidence: (a) that her supervisor expressed his bias against her for being a woman and Hispanic, (b) that he gave her permission to make the discounted purchase that led to her firing and then lied about doing so when asked by his supervisor, and (c) that his supervisor who decided to fire Perez was aware at least of the bias against women and had been involved in the decision merely to warn her supervisor for comparable wrongdoing.
We do not presume lack of bias when the same person has both hired and fired the plaintiff, but we allow the jury to hear such evidence and weigh it for what it is worth. We do so even though the hiring may be distant in time from the firing decision. Similar reasoning applies to Ko-ziol’s remarks, which were made about a year before Perez’s termination. The time difference might lessen their evidentiary punch, but the passage of time does not make them inadmissible. Just as the jury should be permitted to consider the fact that Darlington hired and promoted but then fired Perez, it should also be able to consider that Koziol expressed bias against women and Hispanics in the workplace a year before he became a witness in the investigation into Perez’s conduct and provided information to Darlington that led to her firing. We do not hold that Koziol’s remarks standing alone would be sufficient to satisfy Perez’s entire evidentiary burden at summary judgment. But Koziol’s remarks are part of the evidence of pretext that the jury should have the opportunity to weigh at trial.
Accordingly, Perez has satisfied the indirect method of proof sufficient to avoid summary judgment.
II. Direct Method
Under the direct method of proof, a plaintiff must provide either direct or circumstantial evidence that the employer had a discriminatory motive. Naficy, 697 F.3d at 509. Direct evidence of discrimination would require something akin to an admission by Thorntons that it fired Perez because of her national origin or gender. See Raymond v. Ameritech Corp., 442 F.3d 600, 610 (7th Cir.2006). Perez does not present such evidence. Instead, she proceeds under the direct method using circumstantial evidence. To prevail, Perez must “construct a convincing mosaic” that “allows a jury to infer intentional discrimination by the decisionmaker.” Brown v. *711 Advocate South Suburban Hosp., 700 F.3d 1101, 1105 (7th Cir.2012) (internal quotation marks omitted). Generally, but not exclusively, the pieces of that “mosaic” will fall into three categories. The first includes “suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn.” Cloe v. City of Indianapolis, 712 F.3d 1171, 1180 (7th Cir.2013) (quotation omitted). The second is “evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently.” Id. And the third is “evidence that the employer offered a pretextual reason for an adverse employment action.” Id.
Perhaps illustrating the eroding boundary between direct and indirect proof, our discussion of the indirect method shows how Perez has offered a direct case. Perez has presented circumstantial evidence here from which a jury could reasonably infer that her firing was the product of illegal discrimination. Darlington knew that a few months earlier, Koziol had been warned but not fired when he concealed the fact that a large quantity of alcohol had been stolen from the store and then concocted a secret and risky scheme to catch the thief by inviting additional theft. His conduct did not cause the store to suffer actual economic loss, but he covered up actual economic loss and risked future economic loss. We must assume that Dar-lington also knew that Koziol had expressed his bias against women in the past. And, we must assume that he knew that Koziol had given Perez permission to mark down the candy bars and sell them to herself. Yet, in spite of this knowledge, Darlington decided to fire Perez, while Koziol had not been fired for arguably comparable conduct. This is sufficient circumstantial evidence to construct the “convincing mosaic” that would allow a jury to infer that the decision to terminate Perez was impermissibly biased.
Thorntons contends, and the dissent agrees, that Koziol’s biased remarks cannot establish discriminatory motive because they were isolated, stray remarks. Post at 716-17. We do not find that Ko-ziol’s remarks would be sufficient standing alone. But his remarks do not stand alone. They are coupled with the other evidence in the record, including especially the fact that Koziol, a non-Hispanic male, received merely a warning while Perez, a Hispanic female, was fired, for arguably comparable “inventory control” infractions, and that Perez’s firing was founded on Darlington’s decision to credit Koziol — in spite of his known bias — over Perez. Whether Darlington actually embraced Koziol’s bias or whether Koziol’s bias merely infected Darlington’s investigation and ensuing decision to fire Perez, we cannot, at least as a matter of law, disregard Koziol’s comments as “stray remarks” that say nothing about Perez’s firing.
Whether Perez will be able to convince a jury that she was fired because of her gender or national origin remains to be seen, but she is entitled to have a jury-answer those questions. On this summary judgment record, Perez prevails under both the indirect and direct methods of proof. The judgment of the district court is REVERSED and the case is Remanded for further proceedings consistent with this opinion.

. In Thorntons' version of this meeting, Perez told Darlington that she could not explain the price overrides and that she did not have anyone’s permission. Her only "defense” at that time was that Koziol had also bought candy bars at a marked-down price. Darling-ton then reviewed surveillance footage from earlier that day, which revealed that Koziol had not purchased any products at a reduced price.

. Perez does not explicitly rely on a "cat's paw” theory. See Cook v. IPC Int’l Corp., 67 *709 F.3d 625, 628 (7th Cir.2012) (“the 'cat's paw’ metaphor refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action''); accord, Staub v. Proctor Hosp., - U.S. -, 131 S.Ct. 1186, 1192-94, 179 L.Ed.2d 144 (2011). She contends instead that Darlington was "a knowing participant” in her wrongful termination.- Indeed, we assume that Darlington relied on Koziol's version of events in spite of his knowledge that Koziol had earlier made biased remarks. Although Perez has not embraced a “cat’s paw” theory, it would certainly seem to apply here. In fact, the inference is even stronger than in the usual "cat's paw” situation. If Perez's testimony is believed, Darlington was not Ko-ziol's unknowing pawn but chose to credit Koziol in spite of his knowledge of Koziol’s bias.