In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3661

JOSEPH L. REED,

*Plaintiff-Appellant*,

*v.*

FREEDOM MORTGAGE CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:15-cv-00954 — **James B. Zagel**, *Judge.*

ARGUED APRIL 12, 2017 — DECIDED AUGUST 25, 2017

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges*.

ROVNER, *Circuit Judge.*  Joseph L. Reed sued his former
employer, Freedom Mortgage Company, under the Illinois
Human Rights Act, alleging race-based discrimination. After
concluding that Reed lacked evidence of racial bias, the district
court granted summary judgment in favor of Freedom Mort-
gage. Reed challenges the court's decisions on evidentiary

matters as well as the court's ultimate conclusion on summary judgment. We affirm.

## I.

Freedom Mortgage is a full service residential mortgage lender based in New Jersey, with offices around the country. Reed and co-worker Felicia Bates initially came to work for the company as temporary employees from a staffing agency. On November 1, 2012, Freedom Mortgage hired Reed and Bates as full-time Broker Liaisons at its Downers Grove, Illinois office at the recommendation of Regional Operations Manager Cheryl Bidstrup. Reed and Bates reported directly to Bidstrup who, in turn, reported to the Regional Branch Manager, Vickie Sperry. Reed and Bates are African-American and both Bidstrup and Sperry are white.

The regular hours of operation for the Downers Grove office were 8 a.m. to 5 p.m., although some employees worked other schedules with the permission of senior management. Other employees worked a different schedule in order to accommodate accounts in other time zones. Freedom Mortgage had an employee handbook that contained the company's official Attendance Policy, which stated that seven or more absences, late arrivals, or early departures in a twelve month period could trigger disciplinary action, including termination of employment. Reed understood that he was expected to start work at 8 a.m. each day. He assumed that his co-workers were all on the same schedule but he admitted that other employees may have had permission to work alternate schedules of which he was not aware.

On January 21, 2013, Bidstrup sent an email to the twenty-nine employees who reported directly to her:

Vickie and I pride ourselves on being flexible with our staff and in making the Chicago branch a pleasant place to work. Unfortunately, however, our good natured dispositions with regard to the office atmosphere have been and are being taken advantage of. Therefore, I find it necessary to reiterate the following requirements.

• Our work hours are 8:00 am to 5:00 pm in the Downers Grove physical location with an hour for lunch and 2 - 15 minute breaks. Any deviation from these hours or location must be prior approved by Vickie or me. There will be no further "setting your own hours" and assuming that you can stay until 6:00 pm to make up for coming in at 9:00 am.

• If you are going to be absent <u>or</u> late, you *must* contact me prior to 8:00 am with the reason for your absence or tardiness. If I am unavailable, your voicemail message will be time stamped.

• The *technical* ability to work from home is to be utilized for after-hours work only and only when needed. <u>Working from home during regular business hours must be prior approved</u> by Vickie or me and will only be approved in an *extreme* emergency and is at our discretion. There are only 3 Operations' employees who currently work remotely on a regular basis and have been already approved to do

> so. No additional remote workers are being ap-
> proved at this time.

R. 50-17, AT 2.

Four days after sending that email, Bidstrup issued a verbal warning to Reed for violating the Attendance Policy. And four days after that, Bidstrup issued to Reed a written warning for absenteeism and/or tardiness when he arrived at 9:30 a.m. without notifying his manager in advance. Between February 14, 2013 and April 1, 2013, Reed was absent from work on at least eight days and could not recall whether he had prior approval. Between March 6 and April 10 of that same year, he clocked in late eleven times, sometimes just a few minutes after 8:00 a.m., but more than a half hour late on three occasions. Bates also conceded that she had violated the Attendance Policy numerous times.

Bidstrup eventually informed Sperry that Reed and Bates were repeatedly violating the Attendance Policy. On April 9, 2013, Bidstrup sent out another email to all of the Downers Grove employees reminding them that excessive absences or tardiness could trigger disciplinary action including termination of employment. Because Reed continued to violate the Attendance Policy after receiving oral and written warnings, and because she received complaints from two employees about having to cover Reed's work in his absence, Bidstrup asked the receptionist at the Downers Grove office to monitor Reed's attendance. At some point during his six month tenure, Reed applied for the position of Junior Underwriter but was not offered the job. Reed was also denied opportunities to work from home.

In 2013, a decline in business prompted management at Freedom Mortgage to implement a reduction in force at its locations across the country. At the Downers Grove branch, the position of Broker Liaison was gradually eliminated through multiple rounds of terminations. Among the first three Broker Liaisons selected for termination at the Downers Grove branch were Reed and Bates. Bidstrup and Sperry explained to senior management that they selected Reed and Bates because of their history of attendance and disciplinary problems, and because they had less seniority than others in the office. In April 2013, after working for the company for approximately six months, Reed and Bates were terminated in the reduction in force, along with a white employee. The remaining Broker Liaisons were also eventually terminated, and no one was hired to replace them. The Downers Grove office closed entirely in August 2014. Certain functions and positions, including those of Underwriters and Junior Underwriters, subsequently worked remotely for the Fishers, Indiana office.

After their terminations, Reed and Bates[1] sued Freedom Mortgage for race-based discrimination under the Illinois Human Rights Act.[2] *See* 775 ILCS 5/1-101 *et seq*. Reed alleged that he was subjected to disparate treatment and ultimately

---

[1] Bates' claims were voluntarily dismissed in 2016 and she has taken no part in the appeal.

[2] Reed originally brought his suit in the Circuit Court of Cook County. Freedom Mortgage removed the suit to federal court based on diversity jurisdiction. Reed is a citizen of Illinois. Freedom Mortgage is incorporated in New Jersey, has its principal place of business in New Jersey and is therefore a citizen of New Jersey.

terminated from employment on the basis of race. On cross-motions for summary judgment, the district court concluded that Reed had no evidence that the defendant acted against him on account of his race. In particular, the court found that Reed had no evidence that he was treated less favorably than similarly situated non-African-American employees, that he failed to show that the denial of his request to work from home and the denial of his promotion to the position of Junior Underwriter were adverse employment actions, and that he could not make out a claim for hostile work environment. The court therefore granted judgment in favor of Freedom Mortgage and denied Reed's motion for summary judgment. Reed appeals.

## II.

On appeal, Reed contends that the court should have credited a negative inference created by the defendant's failure to produce certain formal attendance records during discovery. He also objects to the court's refusal to consider as evidence three cell phone videos recorded by Bates. He argues that he presented sufficient evidence to allow a reasonable jury to conclude that Freedom Mortgage discriminated against him in the company's application and enforcement of its Attendance Policy, and in his termination, all on the basis of race. Finally, he asserts that the court erred in finding that he failed to make out a claim for hostile work environment.

We review the district court's grant of summary judgment *de novo*, examining the record in the light most favorable to Reed and construing all reasonable inferences from the evidence in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255 (1986); *Yahnke v. Kane County, Ill.*, 823 F.3d 1066, 1070 (7th Cir. 2016). Summary judgment is appropriate when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Anderson*, 477 U.S. at 256; *Yahnke*, 823 F.3d at 1070. Illinois courts apply the federal Title VII framework to claims of discrimination made under the Illinois Human Rights Act, and the parties agree that it is appropriate to apply the Title VII framework here. *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016); *Zaderaka v. Illinois Human Rights Commission*, 545 N.E.2d 684, 687 (Ill. 1989) (noting that, in analyzing employment discrimination actions brought under the Human Rights Act, the Commission and the Illinois appellate court have adopted the analytical framework set forth in United States Supreme Court decisions addressing claims brought under Title VII, and that the Illinois Supreme Court would follow the same approach).

Reed proceeded under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and the district court evaluated the case using that framework. Under *McDonnell Douglas*, Reed has the initial burden of establishing that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate performance expectations; (3) he was subjected to an adverse employment action; and (4) similarly situated employees outside of his protected class were treated more favorably by the employer. 411 U.S. at 802-03; *David v. Board of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). No matter the framework employed, the ultimate legal question "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race,

ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). In applying this standard, evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself. *Id*.

Before we assess the adequacy of Reed's evidence, we must first address whether the district court erred in declining to consider the cell phone videos that Reed produced and in refusing to apply the negative inference that Reed wished the court to draw from the defendant's failure to produce formal attendance records during discovery. We review the district court's evidentiary rulings for abuse of discretion. *Griffin v. Bell*, 694 F.3d 817, 826 (7th Cir. 2012). The district court declined to consider the cell phone videos because they were not properly authenticated and because Reed's counsel did not timely include the videos in his appendix of exhibits. On appeal, Reed's lawyer challenges only the determination that the videos were not properly authenticated, failing to address the court's second reason for excluding them. "When a district court gives two independent, dispositive reasons for ruling against a party, and the party challenges only one of those grounds, any challenge to the alternate basis is waived and we may affirm." *Griffin*, 694 F.3d at 826. A failure to address a court's second rationale is an adequate basis to affirm the court's decision, but in any case, the videos were properly excluded. Reed's counsel sought to admit them to prove that only African-American employees were required to begin working at 8 a.m., but neither Reed nor Bates (who recorded the videos) could recall the dates or times that the videos were

recorded. Reed could not say whether the videos were re-corded before or after Bidstrup's email advising the workers that they could no longer set their own hours. Moreover, Reed conceded that the videos showed only a limited part of the office. *See Griffin*, 694 F.3d at 826-27 (affirming exclusion of photos and video that displayed only part of the relevant scene and that bore no date or time stamp). There was no abuse of discretion in declining to consider the videos.

Reed's counsel also complains that the court should have applied a negative inference to Freedom Mortgage's failure to produce certain documents during the discovery process. Reed's counsel requested "[a]ll documents that tend to substantiate the allegations asserted in the Complaint." R. 74-7, at 11. He also requested "[a]ll documents relating to any employees who made requests to work from home for the time period of 2012 – present." R. 74-7, at 10. Freedom Mortgage objected to both requests on multiple grounds, including that the requests were overly broad. In his first set of interrogato-ries, Reed's lawyer asked for identifying information regarding each employee who was allowed to work from home and each person who was disciplined as a result of violating the atten-dance policy. R. 50-25, at 10. Freedom Mortgage again objected to the requests on multiple grounds. Reed's lawyer failed to follow up with Freedom Mortgage on the objections and never moved to compel production. Having failed to resolve this simple discovery dispute, the plaintiff's lawyer now seeks to apply a rule from another circuit, where a court held that a party's wilful refusal to comply with a subpoena may give rise to an inference that the withheld information was favorable to its opponent. *International Union, United Auto., Aerospace &*

*Agric. Implement Workers of America v. National Labor Relations Bd.*, 459 F.2d 1329, 1336 (D.C. Cir. 1972) ("Simply stated, the rule provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him."). In this circuit, a negative inference may arise when a party intentionally destroys documents in bad faith. *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 644 (7th Cir. 2008). A document is destroyed in bad faith if it is destroyed for the purpose of hiding adverse information. *Id.* Reed's counsel presents no evidence of bad faith or the hiding of information by Freedom Mortgage. The record shows nothing more than the most ordinary kind of discovery dispute regarding overly broad document requests and interrogatories. Once Freedom Mortgage objected, the onus was on Reed's counsel to attempt to resolve the dispute or compel production. Having failed to do either, there can be no complaint about missing evidence. The negative inference rule is simply inapplicable to the scenario presented here.

We turn to the *McDonnell Douglas* analysis. No one disputes that Reed is a member of a protected class or that his termination was an adverse employment action. The parties dispute whether he was performing to his employer's satisfaction and whether similarly situated employees outside his class were treated more favorably. Reed conceded that he had received oral and written warnings for violating the Attendance Policy, and that he continued to be absent and late on multiple occasions after his employer reiterated both the policy and the consequences for violating it. The question is whether he produced any evidence that similarly situated non-African-American employees were treated more favorably. "Similarly

situated" means directly comparable in all material respects. *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013). The objective is to eliminate other possible explanatory variables such as differing roles, performance histories, or decision-making personnel, in order to isolate the critical independent variable of discriminatory animus. *Perez*, 731 F.3d at 704; *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). "The proposed comparator need not be identical in every conceivable way, however, and courts must conduct a 'common-sense examination.'" *Perez*, 731 F.3d at 704 (quoting *Coleman*, 667 F.3d at 846). Whether a comparator is similarly situated is typically a question for the fact-finder, unless, of course, the plaintiff has no evidence from which a reasonable fact-finder could conclude that the plaintiff met his burden on this issue. *Coleman*, 667 F.3d at 846-47.

Reed points to four white employees as comparators who, he asserts, were treated more favorably than he was: Sandy Bakir, Kathleen French, Bridget Glass and Nicole Landis.[3] Bakir, French and Glass were Team Leads as well as Broker Liaisons. They had significantly greater seniority than Reed. Landis was a Broker Liaison who was given a verbal warning for missing work on a single occasion.[4] If those were the only

---

[3]  On appeal, Reed argues that other white employees also had similar disciplinary problems and poor attendance records, but his claims regarding those other employees suffer the same infirmities as his evidence regarding these four employees, and so we confine our discussion to these four.

[4]  Reed asserts that Landis was once absent for five continuous days. The

(continued...)

differences, we might conclude that the question of similarity should go to the jury. But Reed's counsel presented no evidence that any of these employees had a similar history of violations of the Attendance Policy or a similar disciplinary record. Having failed to follow through on his discovery requests,[5] Reed's lawyer seeks to rely on his client's personal observations of other workers' arrival times and absences from work. Certainly a witness with personal knowledge of a matter may testify to that matter. Fed. R. Evid. 602; *United States v. Mendiola*, 707 F.3d 735, 741 (7th Cir. 2013) ("the knowledge required by Rule 602 is not absolute or unlimited knowledge but simply that awareness of objects or events that begins with sensory perception of them, a comprehension of them, and an ability to testify at trial about them.").

But Reed testified only that he had seen these other employees arrive after 8 a.m. an unspecified number of times on dates that he could not recall. The record does not reveal whether the late appearances came before or after the email

---

[4] (...continued)
company's Attendance Policy treated a continuous multi-day absence as one "occasion."

[5] Reed's counsel attempted to characterize his discovery requests as including personnel and attendance records for comparators, but he requested personnel records only for the plaintiffs themselves. Although attendance records for comparators could arguably be included in the request for "[a]ll documents that tend to substantiate the allegations in the Complaint," that request was so broad and vague that it gave no reasonable framework for a response. Counsel inexplicably failed to request the most relevant records necessary to make out the claim: the personnel and attendance records of non-African-American comparators.

demanding strict adherence to the office schedule. Nor is there evidence regarding whether the other employees had asked for or received permission for alternate schedules as provided in that email, or whether management was aware that other employees were not complying with the Attendance Policy. Except for one instance, there was no evidence of whether any of the other employees had received written or oral discipline for unexcused lateness or absence. In that one instance, Landis had received an oral warning. But the record does not reveal Landis's attendance record after that warning or any evidence of whether Landis' total number of absences approached Reed's record. Nor is there evidence regarding whether any employees were allowed to work from home following the January 21 email ending the practice.

Reed's lawyer simply failed to gather the evidence that would have made his client's personal observations relevant to the fact he was trying to prove. The problem is not, as Freedom Mortgage complains, that Reed failed to corroborate his personal observations. There is no rule requiring corroboration for personal observations. The problem is that Reed's lawyer failed to gather evidence regarding the timing or context of the personal observations that would have made them relevant to the point he was trying to prove, namely, that these employees had similar attendance issues and were treated more favorably. Reed's lawyer did not pursue through discovery any evidence regarding the scheduled work hours of other employees, whether and how often those workers were tardy, whether management was aware of any late arrivals, whether any late workers had permission to be tardy, and whether any other unexcused tardiness resulted in discipline.

Other than a single occurrence with Landis, the record contains no evidence regarding the attendance of similarly situated white employees. On this record, only Reed had so many documented violations of the Attendance Policy, and only Reed continued to violate the Policy after being warned of the consequences of his failure to comply. On this record, Bidstrup was aware only of Reed's repeated violations of the Attendance Policy. Reed's lawyer simply failed to gather any evidence demonstrating that there were any non-African-American employees with Attendance Policy violation records even remotely similar to Reed's. *Ortiz*, 834 F.3d at 765. He therefore cannot demonstrate that Freedom Mortgage treated similarly situated employees more favorably, and his claim fails as a matter of law.

Reed's final argument, that Freedom Mortgage perpetuated a hostile work environment, simply rehashes his claim for race-based termination. The claim is predicated on the assertion that the company employed different attendance policies for African-American and white workers, that African-American workers were disproportionately monitored and disciplined under those policies, and that his termination was the result of the discriminatory application of those policies, all creating a hostile work environment. This claim fails for the same reason as the wrongful termination claim, namely that Reed's lawyer failed to gather evidence demonstrating that the company treated similarly situated non-African-American employees more favorably than African-American employees. We have considered the remaining arguments and find them without merit.

AFFIRMED.