In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 16-4131

TERRANCE S. MCKINNEY,

*Plaintiff-Appellant,*

*v.*

OFFICE OF THE SHERIFF OF WHITLEY COUNTY,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:15-cv-79 — **William C. Lee**, *Judge.*

———————————

ARGUED APRIL 19, 2017 — DECIDED AUGUST 8, 2017

———————————

Before BAUER, POSNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* In 2013 the Sheriff of Whitley County, Indiana hired the County's first black police officer ever, Terrance McKinney. Nine months later, McKinney was fired. He sued for race discrimination. The district court granted summary judgment for the Office of the Sheriff, and McKinney has appealed.

We reverse. Viewed in the light most favorable to plaintiff McKinney, his extensive evidence adds up to a strong case of race discrimination. As we explain in detail, the defendant has offered an ever-growing list of rationales for firing McKinney that fall apart in the face of his evidence. The Sheriff's termination letter provided three reasons for his discharge. Four days later, the Whitley County Board of Commissioners sent McKinney another letter that added two more reasons. After McKinney brought suit, the defense added three more reasons. Yet patch after patch, the defense arguments for summary judgment still will not hold water. McKinney presented evidence that he was treated differently than his similarly situated colleagues who are not black. He also presented substantial evidence that the many rationales offered for firing him were baseless and pretextual. In addition, the district court erred by disregarding most of McKinney's evidence, improperly discounting his testimony as "self-serving," and misreading our precedent on the "common actor" inference that is sometimes argued in discrimination cases. We remand for trial.

I.   *Factual and Procedural Background*

A.  *McKinney's Tenure as a Deputy Sheriff*

Because the Office of the Sheriff moved for summary judgment, we construe all evidence and present the facts in the light most favorable to McKinney, who was the non-moving party. E.g., *Chaib v. GEO Group, Inc.*, 819 F.3d 337, 340 (7th Cir. 2016). On August 5, 2013, then-Sheriff Mark Hodges hired McKinney as a full-time merit officer. This position entails a one-year probationary period during which the Sheriff may fire the officer at his sole discretion, i.e., without approval

from the merit board. See Ind. Code § 36-8-10-10(b). The probationary period is intended to ensure that new officers are capable of performing their duties before they benefit from state law that requires good cause for firing and provides extensive procedural protections. See Ind. Code § 36-8-10-11.

McKinney was Whitley County's first black merit officer. Sheriff Hodges discussed McKinney's race with him during his job interview, and McKinney later testified that he did not expect that he would experience racial discrimination at the Sheriff's Office. After he began, however, a number of incidents started to make him feel uncomfortable. One officer used the "n-word" in front of him. Once when buying coffee, McKinney's fellow officer said that he wanted his "coffee black like my partner." McKinney also testified that the other officers refused to train him and sometimes would not speak to him. Sheriff Hodges told McKinney that he should watch the movie "42," which is about Jackie Robinson breaking the color barrier in major league baseball in 1947. Hodges told McKinney that the movie would "help [him] out."

On May 15, 2014, Sheriff Hodges fired McKinney. The termination notice gave three reasons: submitting false work hours while attending the Indiana Law Enforcement Academy; violating the standard operating procedure that requires filing complete monthly reports; and violating the standard operating procedure that governs fueling county vehicles. Four days later, the Whitley County Board of Commissioners sent McKinney a termination letter that added two more reasons for his discharge: damaging a county vehicle and "failure to complete a transport and follow verbal instructions." After McKinney brought suit, the defense added three more reasons, claiming that McKinney once texted while driving,

crashed a county vehicle, and was late transporting a juvenile to court. These various rationales and McKinney's evidence undermining their credibility are discussed below in Part II-C.

B.  *Discrimination Lawsuit*

After he was terminated, McKinney brought suit against the Office of the Sheriff of Whitley County and Deputy Sheriff Tony Helfrich on several theories. The only claim on appeal is McKinney's claim against his employer, the Office of the Sheriff itself, for race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2. The Office of the Sheriff moved for summary judgment, arguing that McKinney "pointed to no direct evidence of racial discrimination." The defense also argued that McKinney could not establish discrimination through the burden-shifting approach adapted from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), because he did not meet the Sheriff's legitimate employment expectations. As evidence of this, the defense relied on Sheriff Hodges' affidavit, which listed the various rationales that had accumulated since McKinney was fired.

McKinney responded that the racial comments, social exclusion at work, and failure to train provided direct evidence of discrimination. He also submitted unusually detailed evidence—including testimony, interrogatory answers, relevant gas receipts, scheduling records, prisoner transport records, the Sheriff's standard operating procedures, and much more—to show that the supposed reasons for firing him were not only wrong but so baseless as to support an inference of pretext, meaning dishonesty.

The district court granted summary judgment for the defense. *McKinney v. Office of the Sheriff of Whitley County*, No. 1:15-cv-79, 2016 WL 6680288 (N.D. Ind. Nov. 14, 2016). The court wrote that McKinney failed to specify "any direct evidence of discrimination." It also expressed displeasure with the format of McKinney's response to the motion for summary judgment, writing that McKinney "points in general to his Statement of Genuine Issues of Fact" but does "not specify which facts would constitute such direct evidence." The court apparently refused to consider these facts, saying it "is not the Court's job to sift through the record to determine whether there is sufficient evidence to support a party's claim." 2016 WL 6680288, at *5.

The district court also determined that McKinney failed to establish a prima facie case under the *McDonnell Douglas* framework because he failed to meet the Sheriff's legitimate employment expectations. The court based this conclusion almost exclusively on Sheriff Hodges' version of events from his affidavit. The court did not address most of McKinney's evidence, writing that "all that McKinney offers is his own assertions that he was meeting Defendant's legitimate job expectations." The court discounted this testimony as "self-serving, speculative, and conclusory." In addition, the court noted the "strong presumpti[on]" against finding discrimination when the same person both hires and fires a plaintiff-employee: "If Sheriff Hodges wanted to discriminate against McKinney based on his race, he could have refused to hire him in the first place."

II. *Analysis*

   A. *Legal Standards*

Summary judgment is appropriate only if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005), citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To the extent the district court's ruling was based on its local rules, we review the application of those rules for abuse of discretion. See *Friend v. Valley View Comm. Unit School Dist. 365U*, 789 F.3d 707, 710 (7th Cir. 2015); *Harmon v. OKI Systems*, 115 F.3d 477, 481 (7th Cir. 1997) (district court did not abuse discretion by overlooking moving defendant's technical failure to comply with local summary judgment rule where opposing party was not prejudiced).

Title VII prohibits an employer from discharging an employee because of that person's race. See 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove race discrimination either directly or indirectly, and with a combination of direct and circumstantial evidence. The direct method requires the plaintiff to set forth "sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). The indirect method allows a plaintiff to prove discrimination by using the burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). See *Coleman*, 667 F.3d at 845.

In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), we clarified that the "direct" and "indirect" methods are not subject to different legal standards. Courts should not sort evidence of discrimination "into different piles, labeled 'direct' and 'indirect,' that are evaluated differently." *Id.* at 766. Instead, there is a single inquiry: it is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race … caused the discharge." *Id.* at 765. Our decision in *Ortiz* did not alter "*McDonnell Douglas* or any other burden-shifting framework, no matter what it is called as a shorthand." *Id.* at 766.

The *McDonnell Douglas* burden-shifting framework is designed to "sharpen the inquiry into the elusive factual question of intentional discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 n.8 (1981). The plaintiff carries the initial burden of establishing a prima facie case of discrimination, which can be accomplished by setting forth evidence that: "(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff." *Burks v. Wisconsin Dep't of Transportation*, 464 F.3d 744, 750–51 (7th Cir. 2006) (citation omitted). Once established, this prima facie case creates a presumption of discrimination, and the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its employment decision. *McDonnell Douglas*, 411 U.S. at 802. "When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a 'pretext,'

which in turn permits an inference of unlawful discrimination." *Coleman*, 667 F.3d at 845, quoting *McDonnell Douglas*, 411 U.S. at 804.

B. *Plaintiff's Presentation of Evidence*

It is undisputed that McKinney is a member of a protected class and suffered an adverse employment action. To defeat summary judgment by the burden-shifting route, McKinney must also come forward with evidence that he was meeting the Sheriff's legitimate employment expectations and that a similarly situated employee who is not in his protected class was treated more favorably. McKinney presented substantial documentary and testimonial evidence to support his claim, but the district court seems to have disregarded most of his evidence in favor of Sheriff Hodges' affidavit. We first sort out the evidence properly before the district court and then turn to the employer's stated rationales for firing McKinney.

The employer's motion for summary judgment was typical of many such motions in employment discrimination cases. It offered plausible rationales for the employer's action and challenged the plaintiff, who has the burden of persuasion on all or nearly all issues, to come forward with enough evidence to reach a jury.

Plaintiff responded with three documents. Docket entry 30 in the district court docket was a 25-page legal memorandum in opposition to the motion. Docket entry 31 was called Plaintiff's Statement of Genuine Disputes, and it had over 30 pages of detailed factual assertions with numerous citations to supporting evidence. The third document was an evidentiary appendix to the legal memorandum, containing around 125

pages of the evidence cited in the Statement of Genuine Disputes.

The district court disregarded most of McKinney's evidence, and that choice lies at the root of the erroneous grant of summary judgment. The court said McKinney presented no direct evidence of racial discrimination because he "points in general to his Statement of Genuine Issues of Fact" but does "not specify which facts would constitute such direct evidence." The court seemed to indicate that this rendered McKinney's filings noncompliant with the Northern District of Indiana's Local Rule 56-1, but it did not explain further. Instead, the court noted that it need not "sift through the record to determine whether there is sufficient evidence to support a party's claim" and it is the "advocate's job … to make it easy for the court to rule in his client's favor." 2016 WL 6680288, at *5 (citations and quotations omitted.)

The district court was entitled to seek specific guidance through the record, but McKinney provided it here. A party seeking or opposing summary judgment must support his factual assertions about disputed facts with citations to "particular parts of the materials in the record," and the court need consider only the cited materials (though it may consider other materials in the record). Fed. R. Civ. P. 56(c)(1) & (c)(3). A party opposing summary judgment does not meet this obligation by simply dropping a stack of paper into the court file (literally or electronically) and asserting that someone who reads the stack will find a genuine issue of material fact. Accordingly, we have routinely affirmed grants of summary judgment when non-moving parties have failed to guide the court through their evidence. See, e.g., *Sommerfield v. City of Chicago*, — F.3d —, —, Nos. 12-1506 & 13-1265, 2017 WL

2962243, at *3 (7th Cir. July 12, 2017) (affirming partial summary judgment: the judge "rightly declined to wade through the voluminous record to find evidence on a counseled plaintiff's behalf"); *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817–18 (7th Cir. 2004) ("[W]here a non-moving party denies a factual allegation by the party moving for summary judgment, that denial must include a specific reference to the affidavit or other part of the record that supports such a denial. Citations to an entire transcript of a deposition or to a lengthy exhibit are not specific and are, accordingly, inappropriate."); see also *Friend*, 789 F.3d at 710–11; *Davis v. Carter*, 452 F.3d 686, 692 (7th Cir. 2006).

Like many district courts, the Northern District of Indiana has adopted local rules regarding the format of summary judgment filings aimed at avoiding such failings and promoting sound decisions on the merits instead of procedural slipups. We review for abuse of discretion the district court's enforcement of its local rules. *Friend*, 789 F.3d at 710.

In this case, the court's explanation of this important issue was terse, and its exact concerns about McKinney's filings are unclear. As best we can tell, there was no valid ground for refusing to consider McKinney's evidence. Plaintiff's legal memorandum, statement of genuine issues of fact, and supporting evidence provide what the district court said was missing: a detailed and organized guide to plaintiff's evidence supporting his assertions of disputed facts and his legal arguments.

The district court asserted that McKinney failed to "specify which facts" support his claim, but in saying that, the court cited one of many pages on which McKinney *did* include a ci-

tation to the specific, relevant facts: "McKinney in the Statement of Genuine Disputes has presented at length in Dispute 9 what a reasonable trier of fact could determine includes direct evidence supporting racial discrimination." Dkt. No. 30 at 11. Turning to "Dispute 9," the reader finds detailed factual assertions about arguably direct evidence of discrimination, supported by specific citations to supporting evidence. Dkt. No. 31 at 18.

We see nothing in the Northern District's Local Rule 56-1 that plaintiff failed to satisfy, and the district court and the employer have not identified such a failing.[1] The rule specifies the "Required Filings" for a party opposing summary judgment, which include a response brief and any materials that the party claims raise a genuine dispute. In addition, the rule notes that the "response brief or its appendix must include a section labeled 'Statement of Genuine Disputes' that identifies the material facts that the party contends are genuinely disputed."

---

[1] The Northern District's Local Rule 56-1 states in relevant part:

(b) Opposing Party's Obligations.

(1) Required Filings. A party opposing the motion must, within 28 days after the movant serves the motion, file and serve

(A) a response brief; and

(B) any materials that the party contends raise a genuine dispute.

(2) Content of Response Brief or Appendix. The response brief or its appendix must include a section labeled "Statement of Genuine Disputes" that identifies the material facts that the party contends are genuinely disputed so as to make a trial necessary.

McKinney's brief opened by noting his two concurrent filings and how they complied with local rules: "This Brief in response, as well as the Appendix, are filed pursuant to Federal Rule of Civil Procedure 56 and N.D. Ind. L.R. 56-1(b). The Appendix, which is separately filed pursuant to (b)(2), includes a section labeled 'Statement of Genuine Disputes' and contains the material facts that the Plaintiff contends are related to facts that are genuinely disputed." Dkt. No. 30 at 1. In addition, the second page of McKinney's brief included citations to the "Statement of Genuine Disputes," listing where each factual dispute was discussed in that filing. *Id.* at 2.

It is also unclear what action, if any, the district court took in response to the perceived deficiency of McKinney's filings. The court did not strike any part of the filings, and it expressly considered portions of McKinney's testimonial evidence. However, it did not address most of McKinney's other evidence, which, to be frank, demolishes the employer's shifting list of rationales. The court instead relied on the Sheriff's affidavit to determine that McKinney did not meet the Sheriff's legitimate employment expectations. Because the court did not explain its apparent rejection of McKinney's evidence and we see no violation of Local Rule 56-1, we must conclude that the court abused its discretion when it failed to consider fully McKinney's evidence.

C. *The Employer's Stated Rationales for Firing Plaintiff*

The most striking features of this lawsuit are the sheer number of rationales the defense has offered for firing plaintiff and the quality and volume of evidence plaintiff has collected to undermine the accuracy and even the honesty of those rationales. We review these matters in detail, for they are the heart of the case.

### 1. *The Sheriff's Original Reasons*

When Sheriff Hodges fired McKinney, he gave three reasons. None holds water, at least for purposes of summary judgment.

### a. *Falsified Hours at the Indiana Law Enforcement Academy?*

First, the Sheriff claims, McKinney falsified his hours while attending the Indiana Law Enforcement Academy. That Academy is in Plainfield, Indiana, which is approximately 140 miles from the Sheriff's Department in Whitley County. McKinney began a fifteen-week course at the Academy in March 2014. The course entailed ten hours per day at the Academy (including breakfast and lunch) from Monday to Thursday. McKinney stayed overnight on the Academy's campus and ate most meals in the Academy's cafeteria. McKinney's supposedly falsified hours are the hours he recorded for breakfast and lunch to reach ten-hour work days.

McKinney presented ample evidence that he did not fail to meet legitimate employment expectations by falsifying hours and that this rationale was false. The Sheriff has no written policy governing how to calculate compensable hours while attending the Academy. McKinney presented emails showing (a) that he had asked both the Sheriff's administrative assistant and the Chief Deputy Sheriff how he should record his hours at the Academy, and (b) that both confirmed he should record ten hours per day. McKinney also testified that he asked Sheriff Hodges himself about his hours at the Academy, and the Sheriff said: "It's ten-hour days. Any time that you do outside of that ten hours, like you got night classes … just blot down your time." And the Sheriff later confirmed

that McKinney was correctly documenting his hours, telling him "just keep doing what you're doing." Finally, McKinney presented timesheets showing how other officers had calculated their time while attending the Academy. *None of them clocked out for lunch.* They all just recorded ten-hour days. Based on this evidence, a jury could reasonably infer that Sheriff Hodges' first stated rationale for firing McKinney was not just a misunderstanding but a pretext.

### b. *Missing Monthly Report?*

Second, the Sheriff claimed McKinney did not meet legitimate employment expectations because he failed to comply with the standard operating procedure that required him to submit complete monthly reports. As a preliminary matter, there simply is no standard operating procedure governing monthly reports. McKinney testified to this effect, and the Sheriff appears to acknowledge this in an interrogatory response.

The supposed infraction involved one missing monthly report, and that was for a month that McKinney spent entirely in training at the Academy. McKinney testified that since the monthly report simply lists his law enforcement activities (e.g., number of traffic stops, arrests, etc.), he had no reason to submit it while training at the Academy. Since he had already submitted his gas receipts, it would have amounted to "turn[ing] in a blank document." McKinney testified that no one told him to submit a monthly report for his time at the Academy until four days before his termination. Once he was told the report was needed, he submitted it within an hour. The defendant has not tried to refute McKinney's evidence on this point. It simply states on appeal that he "did not turn in

his monthly report as required by the Whitley County Sheriff's Department [standard operating procedures]." Firing someone for violating a standard operating procedure that does not actually exist, or about which he was not told, could easily be found to be a pretext.

### c. *Misusing Gasoline Credit Card?*

Third, the Sheriff claimed McKinney violated the standard operating procedure that governs fueling county vehicles. This is so, the Sheriff said, because McKinney used his official gasoline credit card to fuel his county-provided car while attending the Academy in Plainfield instead of using the designated county gas facility in Whitley County. In this instance, there was a standard operating procedure, but McKinney presented substantial evidence that he did not actually violate it. He also presented evidence that he received express permission from his supervisors to use his credit card and that other officers used their credit cards in the same way he had. This evidence would allow a jury to find that the Sheriff's rationale was both wrong and dishonest.

The relevant part of the standard operating procedure reads: "Gasoline credit cards shall be … Used only with a county commission [i.e., vehicle] when fueling at the county facility is not available; Used only for purchases of gas and oil without prior approval from the Sheriff or Chief Deputy." McKinney presented evidence that the county facility in Whitley was "not available" when he was approximately 140 miles away at the Academy in Plainfield. McKinney testified that several senior officers instructed him that he was required to keep his fuel tank at least half full in case of emergencies. Basic math shows that his squad car could not make the round trip to and from Plainfield on one tank of gas, let

alone half a tank, so he had to use his gas credit card to fuel his vehicle when he was at the Academy. McKinney also testified that before leaving for the Academy the Chief Deputy Sheriff asked: "[Y]ou got your gasoline credit cards? ... you're gonna need those." Finally, McKinney presented dozens of gas receipts from other officers that spanned several years. *They had also used their gas cards to fuel their county-owned vehicles while attending the Academy.* Again, this evidence would easily support an inference that the Sheriff's rationale for firing McKinney was not merely mistaken but dishonest.

2.  *The Commissioners' Rationales*

Four days after the Sheriff issued the initial termination letter, the Whitley County Board of Commissioners added two new reasons for McKinney's discharge. The County Board said that McKinney damaged a county vehicle and failed to complete a detainee transport. For summary judgment purposes, these two rationales fare as poorly as the Sheriff's first three.

The vehicle damage, as explained by McKinney's testimony, was a slight ding to the side view mirror of his squad car. This damage occurred when he was responding quickly to an emergency message that an officer was in trouble. After the emergency was resolved (fortunately it turned out to be a false alarm), McKinney reported the ding on his mirror, and he was told by a detective that it was "No big deal." Nonetheless, the Sheriff testified that McKinney violated the standard operating procedure that requires officers to report an accident from the scene where the accident occurred.

Once again, the Sheriff seems to have misconstrued his own standard operating procedures. The policy says in relevant part: "All such crashes shall be investigated at the scene, as soon as possible, unless an emergency or other justifiable reason causes a delay." McKinney presented evidence that he was responding to an emergency. The employer has not disputed his evidence. Based on this record, McKinney's conduct simply did not violate the standard operating procedure. What's more, McKinney testified that another new officer who was white had an accident that tore off the front bumper of his squad car. That officer did not receive a reprimand. Instead, other officers joked about the accident and gave him the wrecked bumper as a gag gift at a Christmas party.

The Commissioners' second new rationale was McKinney's "Failure to complete a transport" and to follow certain unspecified instructions. McKinney presented evidence that he completed the transport as ordered. He submitted the actual transport records that include the date, time, and location of the completed transport, along with signatures by the approving officials. As for the "instructions," McKinney testified in detail, explaining how he followed the exact instructions that he received. Again, considering the evidence in the light reasonably most favorable to McKinney, his evidence refuting the charges is so specific that a jury could reasonably conclude that these added rationales for his firing were not only mistaken but dishonest.

3. *Still More Rationales*

After McKinney brought suit, the defense offered three more rationales for McKinney's termination: texting while driving; an accident in a vehicle; and a late transport of a ju-

venile to court. The Sheriff's Office did not develop these rationales and mentions them only in passing on appeal. McKinney offered evidence controverting or explaining these as well, just as with the first five rationales for his termination.

The Sheriff testified that another officer reported that she saw McKinney texting while driving. McKinney told the Sheriff that he was not texting, but rather using his phone's GPS function. The Sheriff said "regardless, he admitted to using his phone while driving which is contrary to our [standard operating procedures] and is extremely unsafe." Yet again, the Sheriff misreads his own standard operating procedures. The relevant provision says only that cell phones may "not be used for texting while the vehicle is in motion," and it specifically permits some uses of cell phones: "Use of cellular telephones while driving is permitted only when it can be done safely." McKinney presented evidence that he was not texting and that he was using his phone in a way permitted by the relevant standard operating procedure.

The Sheriff's Office also asserts that McKinney had a second "chargeable accident" with a vehicle (the first was the ding to his side mirror), but does not explain any further. In his deposition McKinney indicated this accident occurred while he was driving in a snowstorm and slid off the road into a guardrail.

The defense also now claims that McKinney was late transporting a juvenile to a court proceeding. Again, McKinney explained the incident in detailed testimony. In short, he was told that two juveniles were at the same location when they were not, and as a result, the transport was about one minute late.

The Sheriff's Office failed to explain these rationales at all, and McKinney presented evidence to challenge or explain them. The fact that the defendant did not offer any of these rationales at the time it fired McKinney also calls into question whether any of these reasons actually motivated the firing, so these could easily be deemed pretexts, as well.

D. *Sufficient Evidence to Survive Summary Judgment*

Thus, McKinney offered substantial circumstantial evidence at summary judgment to support his claim of racial discrimination. The core question is "simply whether [McKinney's] evidence would permit a reasonable factfinder to conclude that the plaintiff's race … caused the discharge." *Ortiz*, 834 F.3d at 765. McKinney's evidence would easily support such a finding. He offered various forms of evidence—including testimony, interrogatory answers, internal department documents, and more—to show that: officers and supervisors made inappropriate racial remarks to him; he was socially ostracized; supervisors failed to train him adequately; he was fired for conduct that supervisors expressly authorized (e.g., recording ten-hour days at the Academy, using his gas card, and more); he was treated more harshly than other employees for the same conduct (e.g., dinging his side mirror); he was penalized for violating standard operating procedures that either did not exist or that he did not in fact violate (e.g., the monthly report, use of his cell phone's GPS function); and more. In response, the Sheriff's Office has offered sparse evidence, relying almost exclusively on an affidavit from Sheriff Hodges. After reviewing this evidence, a reasonable factfinder could conclude that McKinney was fired because of his race.

McKinney also offered sufficient evidence to satisfy the *McDonnell Douglas* burden-shifting framework. At the first stage of *McDonnell Douglas*, where McKinney must establish a prima facie case, our inquiry is objective. We do not inquire into the subjective belief of the employer, such as whether the employer made an honest mistake. The *McDonnell Douglas* division of labor reserves that consideration for the pretext analysis. E.g., *Gilty v. Village of Oak Park*, 919 F.2d 1247, 1251 (7th Cir. 1990) ("[T]he determination of whether a plaintiff is 'qualified' requires an objective analysis. As such, an employer's knowledge or lack of knowledge is of no relevance at the prima facie stage of the case."); see also *Pilditch v. Board of Education of City of Chicago*, 3 F.3d 1113, 1117 (7th Cir. 1993) (at prima facie stage, relevant question is not whether employee satisfied employer's legitimate employment expectations "in the subjective sense" but rather "whether the employee is able to put on objective evidence that he is sufficiently competent to satisfy the legitimate expectations of an employer").

Here, McKinney presented evidence that rebuts defendant's claim that he did not meet legitimate employment expectations. He also presented evidence that shows he was treated differently than similarly situated employees who were not in his protected class. Because it is also undisputed that McKinney is a member of a protected class and suffered an adverse employment action, he has established a prima facie case of discrimination. See *Burks*, 464 F.3d at 750–51.

The Sheriff's Office has satisfied the second step of *McDonnell Douglas* by articulating what would be legitimate, nondiscriminatory reasons for the termination. See *McDonnell Douglas*, 411 U.S. at 802. That shifted the burden to McKinney to offer evidence that the stated reasons were pretexts. As we

explained above, McKinney has presented ample evidence that the stated non-discriminatory reasons are pretextual. Evidence that the employer has offered false reasons for its actions permits an inference of unlawful discrimination. See *Coleman*, 667 F.3d at 845, quoting *McDonnell Douglas*, 411 U.S. at 804; *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) ("it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation").

E.  *Additional Issues*

The foregoing warrants reversal, but we write further to note two additional legal errors in the summary judgment order. First, the court was wrong to discount McKinney's testimony as "self-serving, speculative, and conclusory." Our cases for at least the past fifteen years teach that "Self-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment." *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 459–60 (7th Cir. 2014) (citations omitted). We have tried often to correct "the misconception that evidence presented in a 'self-serving' affidavit is never sufficient to thwart a summary judgment motion." *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003); see especially *Hill v. Tangherlini*, 724 F.3d 965, 967 & n.1 (7th Cir. 2013) (overruling earlier cases indicating "self-serving" evidence could not be used to show genuine dispute of fact) ("Deposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving. As we have repeatedly emphasized over the past decade, the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment.") (citations omitted).

Second, the district court seems to have overestimated the strength of the "common actor" inference when it wrote that if the Sheriff had wanted to discriminate against McKinney, he would have refused to hire him in the first place. As we have explained, the "common actor inference says it is reasonable to assume that if a person was unbiased at Time A (when he decided to hire the plaintiff), he was also unbiased at Time B (when he fired the plaintiff)." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 710 (7th Cir. 2013). The district court used this principle by relying on our decision in *EEOC v. Our Lady of Resurrection Medical Center*, 77 F.3d 145, 151–52 (7th Cir. 1996). Our cases since then, however, have clarified that this inference is not a conclusive presumption and that it should be considered by the ultimate trier of fact rather than on summary judgment or the pleadings. See, e.g., *Perez*, 731 F.3d at 709 ("The 'common actor' or 'same actor' inference is a reasonable inference that may be argued to the jury, but it is not a conclusive presumption that applies as a matter of law. … That inference is 'something for the trier of fact to consider.'") (citations and quotations omitted); *Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 747 (7th Cir. 2002) ("It is misleading to suggest (as some cases do) that [the common actor inference] creates a 'presumption' of nondiscrimination, as that would imply that the employee must meet it or lose his case. It is just something for the trier of fact to consider.") (citations omitted); *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 361 (7th Cir. 2001) ("We emphatically rejected the 'same-actor inference' in the race-discrimination setting in *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 745 (7th Cir. 1999)… .").

We have tried to impose limits on the common actor inference to ensure it does not outgrow its usefulness. The inference may be helpful in some limited situations, which is why

"we allow the jury to hear such evidence and weigh it for what it is worth." *Perez*, 731 F.3d at 710. There are many other occasions, however, where it is unsound to infer the absence of discrimination simply because the same person both hired and fired the plaintiff-employee. Examples abound. The same supervisor may need to fill a position quickly, then later when the exigency subsides, fire the employee due to unlawful bias. The same supervisor could both hire a woman and then refuse to promote her for discriminatory reasons. The same supervisor could both hire a woman and later fire her because she became pregnant. Cf. *Young v. United Parcel Service, Inc.*, 575 U.S. —, —, 135 S. Ct. 1338, 1343 (2015) ("The Pregnancy Discrimination Act makes clear that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy."). The list could go on, but only one more example is needed. The same supervisor could hire a county's first black police officer, hoping there would be no racial friction in the workplace. But after it became clear that other officers would not fully accept their new black colleague, that same supervisor could fire the black officer because of his race based on a mistaken notion of the "greater good" of the department.[2]

For the foregoing reasons, we REVERSE the district court's grant of summary judgment, and we REMAND for further

---

[2] Our caution toward the common actor inference is supported by substantial research in the social sciences. See, e.g., Victor D. Quintanilla & Cheryl R. Kaiser, *The Same-Actor Inference of Nondiscrimination: Moral Credentialing and the Psychological and Legal Licensing of Bias*, 104 Cal. L. Rev. 1, 6, 11–18 (2016) ("the implicit behavioral theories underpinning the same-actor doctrine have been discredited by decades of psychological science on aversive racism, implicit bias, and moral licensing").

proceedings on McKinney's Title VII claim consistent with this opinion.